In the Matter of AIRMOTIVE SUPPLIERS, INC., Bankrupt.

UNITED STATES of America, Appellant,

v.

Jeanette TAVORMINA, Trustee, Appellee.

No. 74–1305.

United States Court of Appeals, Fifth Circuit.

Sept. 17, 1975.

Robert W. Rust, U. S. Atty., Henry C. Stockell, Jr., Asst. Reg. Counsel, IRS, Miami, Fla., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Chief, Appellate Sec., Crombie J. D. Garrett, Karl Schmeidler, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Herbert Stettin, Miami, Fla., for appellee.

Levenson & Richman, Miami, Fla., for Ecuatoriana.

Gunn & Venney, Miami, Fla., for Airmotive.

Before RIVES, WISDOM and COLEMAN, Circuit Judges.

RIVES, Circuit Judge:

The trustee in bankruptcy filed in the bankruptcy court his petition for a determination as to the validity of any claim by the Internal Revenue Service for prepetition penalties and post-petition penalties against the bankrupt [App. 7]. After a hearing, the Referee or Bank-

ruptcy Judge "ORDERED, ADJUDGED and DECREED . . . that the Government has no lien on or claim to the notes and proceeds for any penalties due or claimed to be due on the notes held by it or the proceeds therefrom" [App. 80]. On petition for review the district court affirmed that judgment [App. 88]. On the present appeal the United States insists (1) that the bankruptcy court lacked summary jurisdiction to adjudicate the controversy, and (2) that the judgment was erroneous. We hold with the United States on Issue (1). As to Issue (2), we vacate the judgment and remand the case to the district court.

In September, 1970, Airmotive, which owed more than $200,000 in delinquent taxes, sold part of its assets to Ecuatoriana Airlines, the national airline of Ecuador. Ecuatoriana made a cash payment and gave Airmotive three noninterest-bearing promissory notes, totaling in face value $594,500. Payments of $5,000 per month began in December, 1970, and are scheduled to continue until October, 1980. On February 24, 1971, after the IRS threatened to padlock the doors to the company's offices, Mr. Leonard Epstein, Airmotive's president, carried the three promissory notes to the local IRS office where he handed them to Revenue Officer Bockhold, who served on him a notice of seizure. The notice described the notes and stated:

"Protective Custody Seizure: President of Airmotive will attempt to secure purchaser for these notes at more than the amount of tax due. When purchaser is secured notes will be released for payment of tax. Seizure protects payment Agreement." [App. 77.]

Bockhold testified that the payment agreement to which the notice of seizure referred was Airmotive's agreement to pay taxes currently due and that the notes were to secure the payment of past due taxes, penalties, and interest thereon. Bockhold told Mr. Epstein that he could redeem the notes by tendering the taxes, penalties, and interest; that

the IRS would allow Airmotive to sell the notes if the price would cover the company's obligation to the IRS; and that, if the IRS sold the notes, any amount in excess of Airmotive's liability would be refunded. He also told Epstein that, if a buyer were not found, the IRS would apply against the penalties and interest the monthly payments received from Ecuatoriana. Since additional penalties would be assessed on the remaining unpaid past due amount, Bockhold told Epstein that "the notes would just barely pay the amount of penalties and interest that would accrue over the [next] . . . ten years." [App. 27.]

Bockhold sent the notes for safekeeping to the IRS Special Procedure Section at Jacksonville, Florida, accompanying them with a "collateral deposit record." [App. 28.] The IRS was unable to find a purchaser for the notes, but is still collecting the monthly payments from Ecuatoriana. Mr. Epstein traveled to Ecuador in an effort to find a buyer for the notes but was unsuccessful. Three months after the IRS took physical possession of the notes, Airmotive endeavored to make an arrangement with its creditors under Chapter XI of the Bankruptcy Act. The efforts failed and, on August 2, 1971, Airmotive was adjudged a bankrupt. The government filed a "proof of claim" for $253,065.16 in unpaid taxes. [App. pp. 92, 93.] The proof of claim did not include amounts for penalties. In November, 1971, the trustee in bankruptcy requested the bankruptcy court to decide whether the IRS could satisfy penalties and interest thereon out of the payments made by Ecuatoriana.

■ Before the district court and again on this appeal, the government contended that the bankruptcy court lacked summary jurisdiction and that it erred in not transferring the case to the civil docket of the district court.

"Section 2 and 23 [of the Bankruptcy Act] together confer two distinct classes of jurisdiction: (1) jurisdiction upon a . . . court of bankruptcy over the *proceedings in bankruptcy*

. . . .; (2) jurisdiction . . . upon a federal district court, sitting as a court of law or equity, of *controversies at law or in equity*, as distinguished from proceedings under the Act." [Emphasis supplied. Footnotes omitted.]

Collier on Bankruptcy, 14th ed., ¶ 2.06. The first type of jurisdiction is summary and the second type is plenary. Where the disputed property is in the possession of an adverse claimant who has more than a colorable claim to it, the adverse claimant has a right to a plenary hearing, but, nonetheless, may consent to submit his claim to the summary jurisdiction of the bankruptcy court. See Collier on Bankruptcy, 14th ed., ¶ 23.08. That consent may be either explicit or implied. The trustee argues that the government, by its failure to object to the bankruptcy court's summary jurisdiction and by its filing of a proof of claim, consented to submit its entire claim, including penalties and interest, to the summary jurisdiction of the bankruptcy court. [See § 2(7) of the Act and Collier, *supra*, ¶ 23.08(4), ¶ 23.08(6).]

The 1952 amendment to section 2a(7) of the Act provides that

"[W]here in a controversy arising in a proceeding under this Act an adverse party does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction."

Pub.L. 456 (S. 2234), 82d Cong., 2d Sess. (1952). The House Report on the bill explained the amendment as follows:

"The bankruptcy court, where a controversy involves property not in its actual or constructive possession, and adversely held, nevertheless has summary jurisdiction if the respondent consents thereto; and it has generally been held that a respondent consented when he did not object to such jurisdiction, either by preliminary motion or in his answer, and proceeded on the merits. *Moonblatt v. Kosmin*, 55 Am. B.R. (N.S.) 267, 139 F.2d 412 (C.C.A.3d 1943). However, in 1944, in *Cline v. Kaplan*, 323 U.S. 97 [65 S.Ct. 155, 89 L.Ed. 97], the Supreme Court overruled this line of cases and held, in effect, that a respondent is not to be deemed to have consented, if he made formal objection to the summary jurisdiction at any time before entry of the final order in the proceeding, even though the controversy had been proceeded with on its merits without his objecting to jurisdiction. This holding has unsettled sound procedure and an expeditious administration in bankruptcy. A respondent may now proceed on the merits and gamble on a favorable decision. When he perceives or fears that the decision will be against him on the merits, he may interpose his formal objection to jurisdiction at any time before the entry of the order, and, should his objection be sustained, the summary proceeding must be dismissed. In such event, the trustee is required to relitigate the issues in a plenary action."

See Collier, *supra*, ¶ 23.08, p. 545.

While the government filed no formal pleading objecting to the summary jurisdiction of the court of bankruptcy, the counsel for the trustee himself explained to the bankruptcy judge his understanding that the government did so object. "MR. STETTIN [attorney for the trustee]: Their position is you don't have any jurisdiction at all, period, at any time to make a decision as to whether they can assess penalties because they took it prior to bankruptcy." [App. 67.] Subsequent proceedings before the bankruptcy judge were based upon that premise, for example:

"MR. STETTIN: I am in agreement with counsel again as to the procedures they must follow and that they have followed.

"The only attack that the Trustee makes is on the position of the government that these notes are owned by the government to the extent that you don't have jurisdiction and they can do and assess against them what they want.

"THE COURT: Let's assume I say I have jurisdiction but they are entitled to collect penalty out of there.

"MR. STETTIN: Okay, I will concede the first part, that you do have jurisdiction.

"I think the Act forbids you to allow them penalties. Interest, yes; penalties, no.

"The Act specifically says the I.R.S. cannot collect penalties against the Trustee.

"THE COURT: Not against the Trustee. Out of the estate.

"MR. STETTIN: Property of the estate; right.

"I don't think there is any question this is property of the estate. It's just subject to an agreement with them that they can hold it to get paid." [App. 70–71.]

It thus clearly appears, even in the absence of formal pleadings, that the government intended to interpose objection to the summary jurisdiction of the bankruptcy court. There may remain to be considered the question of whether, despite that intent, the government's filing of its proof of claim for the unpaid taxes exclusive of penalties authorized the bankruptcy court to exercise its summary jurisdiction to adjudicate the question of whether the government can apply any part of the proceeds of the notes to the payment of pre-petition or post-petition penalties. Any such source of summary jurisdiction is negatived by our decision in *B. F. Avery & Co. v. Davis*, 5 Cir. 1951, 192 F.2d 255, 258.

By its seizure on February 24, 1971, a little over five months before bankruptcy on August 2, 1971, the government took possession of the three promissory notes with something more than a color-able claim to collect from the proceeds of the notes its entire claim for unpaid taxes including interest and penalties. In the absence of consent to summary jurisdiction, the government is entitled to have its claim adjudicated in a plenary suit. *Phelps, Receiver v. United States*, 1975, 421 U.S. 330, 95 S.Ct. 1728, 44 L.Ed.2d 201.

The judgment is vacated and the case is remanded to the district court for consideration of whether that court can and should acquire jurisdiction to adjudicate the controversy under Rule 915(b) of the Bankruptcy Rules of Practice, or in some other way, failing which the action should be dismissed. The costs of appeal are taxed against the appellee.

Vacated and remanded.